```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

                       CHARLESTON
```

**JOHN WILEY,**

    **Plaintiff,**

**v.**                                     **CASE NO. 2:08-cv-00124**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, John Lee Wiley (hereinafter referred to as "Claimant"), filed an application for SSI on October 5, 2000, alleging disability as of September 1979, due to back pain, chronic lung disease, nerves and hiatal hernia. (Tr. at 63-65, 71.) The claim was denied initially and upon reconsideration. (Tr. at 47-51, 54-56.) On August 22, 2001, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 57.) The hearing was held on December 7, 2001, before the Honorable Don C. Paris. (Tr. at 222-59.) By decision dated March 6, 2002, the ALJ determined that Claimant was entitled to benefits as of April 30,

2001, but not before. (Tr. at 14-25.) The ALJ's decision became the final decision of the Commissioner on January 9, 2004, when the Appeals Council denied Claimant's request for review. (Tr. at 4-6.) Claimant appealed to federal court, and on February 3, 2005, the presiding District Judge adopted the undersigned's recommendation that the case be remanded on the grounds that the ALJ did not explain the weight afforded the opinion of Claimant's treating physician, Linda Kessinger, M.D. and because the ALJ failed to explain his reasons for finding Claimant disabled as of April 30, 2001. (Tr. at 269-99, 301-11.) On October 5, 2005, a second ALJ, the Honorable William H. Gitlow, conducted an administrative hearing at which Claimant was not present. (Tr. at 331-55.) By decision dated October 26, 2005, ALJ Gitlow determined that Claimant was disabled beginning October 31, 2001. (Tr. at 274-289.) On January 28, 2008, the Appeals Council accepted the ALJ's findings, except for the disability onset date. The Appeals Council determined that Claimant was disabled as of April 30, 2001, but not prior thereto. (Tr. at 261-64.) On February 21, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful

activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 277.) Under the second inquiry, the ALJ found that Claimant suffers from severe musculoskeletal and respiratory impairments. (Tr. at 278.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 278-79.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 284.) As a result, Claimant cannot return to his past relevant work. (Tr. at 286.) The ALJ concluded that Claimant was disabled as of October 31, 2001, when he attained the age of 55 and, therefore, met the Medical-Vocational Guidelines. (Tr. at 286-87.) Prior to this date, the ALJ concluded that Claimant could perform the jobs of inspector, assembler, hand packer, bench work laborer and mail

addresser, which exist in significant numbers in the national economy. (Tr. at 287.) On this basis, benefits were denied for the time period from June 27, 1998, through October 30, 2001. (Tr. at 288.)

As noted above, the Appeals Council affirmed the findings of the ALJ, except that it amended Claimant's onset to April 30, 2001, based on the directive contained in 20 C.F.R. § 416.963(b) that the age categories will not be applied mechanically in a borderline situation. In addition, the Appeals Council interpreted the presiding District Judge's and the undersigned's findings as affirming the April 30, 2001, onset date. (Tr. at 263.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v.Sullivan, 907 F.2d

5

1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was fifty-five years old at the time of the first administrative hearing. (Tr. at 228.) Claimant completed the eighth grade. (Tr. at 229.) Claimant had not worked since 1980 when he was injured on the job, and as a result, has no relevant past work history. (Tr. at 231.)

The Medical Record

The court has reviewed all evidence of record, and will primarily summarize below, the medical evidence related to the relevant time period from June 27, 1998, through April 30, 2001.

On November 4, 2000, Claimant underwent an MRI that showed degenerative disc disease most prominently seen at the L4-5 level. (Tr. at 128.)

On February 28, 2001, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, with occasional postural limitations, and that Claimant should avoid concentrated exposure

to extreme cold, vibration, fumes, odors, dusts, gases and poor ventilation. (Tr. at 129-36.)

On June 7, 2001, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, with occasional postural limitations, except an inability to climb ladders, ropes and scaffolds, and that Claimant should avoid concentrated exposure to extreme cold, heat and fumes, odors, dusts, gases and poor ventilation and even moderate exposure to hazards. (Tr. at 137-44.)

The record includes treatment notes from Harts Health Clinic dated 1990 through July 3, 2001. On October 5, 1998, Claimant underwent an MRI of the lumbar spine, which showed a small central disc herniation at L4/5 and a left lateral bulging disc at L5/S1 with neural foraminal compromise on the left at L5/S1. (Tr. at 197.) X-rays of the thoracic and lumbar spine on November 27, 1998, showed degenerative changes. (Tr. at 186.) On March 11, 1999, Claimant reported that he was treated by a chiropractor with some short term relief. Claimant complained of dizziness. Dr. Kessinger diagnosed chronic pain, dizziness, history of thyroid, foreign body in his right hand and tobacco addiction. (Tr. at 180-81.) On May 3, 1999, Dr. Kessinger noted that Claimant's dizziness had resolved. An EEG was normal. Claimant was encouraged to stop smoking. (Tr. at 179.) On July 13, 1999, Dr.

Kessinger noted that Claimant had a urinary tract infection/urinary hesitancy, neck pain and chronic pain. (Tr. at 178.) On October 18, 1999, Dr. Kessinger diagnosed hematuria. (Tr. at 175.) Claimant underwent an intravenous pyelogram, which showed normal functioning kidneys with no evidence of obstructive uropathy. (Tr. at 173.) On October 29, 1999, another physician, S.C. Bhanot, M.D. noted that Claimant was status post passage of a ureteral stone. (Tr. at 172.) On November 16, 1999, Dr. Kessinger noted that Claimant had persistent hematuria and right flank pain. She again encouraged Claimant to stop smoking. (Tr. at 171.)

On November 30, 1999, Claimant's degenerative joint disease was well controlled and stable with pain medication, as was his COPD. Dr. Kessinger encouraged Claimant to undergo cystoscopy to rule out bladder cancer. (Tr. at 169.) On January 3, 2000, Claimant lifted a heavy object and had chest soreness. (Tr. at 167.) (Tr. at 167.) On January 3, 2000, Claimant was diagnosed with COPD/hyperinflation, left costophrenic angle adhesions based on a chest x-ray. (Tr. at 201.)

On January 10, 2000, George R. Beneke, M.D. wrote that he examined Claimant for complaints of persistent microscopic hematuria. Urinalysis showed a trace of red cells, no white cells, no glucose, protein or ketones. Dr. Beneke asked Claimant to have a PSA drawn and recommended that Claimant undergo cystoscopy. (Tr. at 164.)

8

On June 22, 2000, Dr. Kessinger noted the results of Dr. Beneke's examination. (Tr. at 163.) On July 6, 2000, Dr. Kessinger again treated Claimant for complaints related to upper urinary tract infection. (Tr. at 161.) On October 31, 2000, Claimant saw Dr. Kessinger for leg pain and back pain, as well as new left leg numbness. She recommended an MRI and noted that Claimant had some depression. She prescribed Wellbutrin. (Tr. at 159.)

An MRI of the lumbar spine on November 4, 2000, showed degenerative disc disease most prominently seen at the L4-5 level. (Tr. at 195.) Claimant was referred to a chiropractor. (Tr. at 190-94.) On December 7, 2000, Dr. Kessinger completed a form on which she noted that Claimant had bent posture and a marked limp to his gait. (Tr. at 154.) She noted Claimant's diagnoses of COPD, chronic back pain, osteoporosis and peptic ulcer disease, status post GI bleed, hiatal hernia, hypercholesterolemia, hematuria and depression. Dr. Kessinger opined that Claimant's "education [and] work experience [and] skills limit [his] ability to work. [Claimant is] unable to tolerate manual labor due to chronic back pain." (Tr. at 154.)

On April 3, 2001, Dr. Kessinger examined Claimant and noted that Claimant had the flu, but was feeling much better. She diagnosed chronic pain and refilled Claimant's Darvocet prescription. She also diagnosed COPD and osteoporosis. (Tr. at

9

150.) On April 17, 2001, Claimant underwent a bone scan showing readings for the lumbar spine in the moderately severe osteoporotic range and readings for the left hip in the borderline osteoporosis range. (Tr. at 147.)

On May 13, 2001, Dr. Kessinger wrote that Claimant's bone scan "shows you do have osteoporosis with high risk of fracture to your back and some increased risk to your hips. You need to take 1500 mg of Calcium plus Vit[amin] D each day and a medicine like Miacalein nose spray to strengthen your bones." (Tr. at 146.) On July 3, 2001, Claimant requested a walker from Dr. Kessinger for times when his pain is so severe he has trouble walking. Dr. Kessinger continued to diagnose osteoporosis and hyperlipidemia. Claimant also reported dizziness. Dr. Kessinger urged Claimant to stop smoking. (Tr. at 145.) On October 30, 2001, Dr. Kessinger prescribed a walker and indicated it was "needed to prevent falls [and] assist [with] getting up [and] walking." (Tr. at 221.) Dr. Kessinger noted Claimant's diagnoses of degenerative joint disease and osteoporosis. (Tr. at 221.)

A State agency medical source completed a Psychiatric Review Technique form on August 7, 2001, and opined that Claimant's mental impairments were not severe. (Tr. at 204-17.)

At the second administrative hearing on October 5, 2005, the ALJ called Dr. Marshall to testify. Dr. Marshall testified that Claimant's diagnosis of osteoporosis in and of itself was not

disabling. Dr. Marshall explained that osteoporosis in its early stages usually produces no symptoms and that limitation in function only occurs following several compression fractures. (Tr. at 339.) Dr. Marshall further testified that Claimant should only perform light work because he would "be more likely to develop pain or discomfort in the back, even without fracture. The main thing would be that heavy work could result in abnormal stresses on the individual vertebrae that might in time result in a compression fracture that could cause increased discomfort." (Tr. at 341.) Dr. Marshall testified that a person with osteoarthritis should avoid use of an assistive device. (Tr. at 347.)

Dr. Marshall also completed a Medical Assessment of Ability to do Work-Related Activities (Physical) on which he opined that Claimant could perform light work, that he could stand four hours in an eight-hour workday, one to two hours without interruption, that Claimant had no sitting limitations, that Claimant could occasionally stoop, crouch and crawl, that Claimant should never climb scaffolding and that Claimant should avoid heights, cold, chemicals, dust, fumes and vibration. (Tr. at 323-25.) Dr. Marshall did not believe that Claimant was disabled during the period from June 27, 1998, through October 30, 2001. (Tr. at 328.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the Appeals Council

11

erred in giving Claimant only ten days to appeal its decision; (2) the ALJ erred in accepting the opinion of a nonexamining medical expert over the opinion of Claimant's treating physician, Dr. Kessinger, without seeking further information from Dr. Kessinger; and (3) the testimony of the ALJ conflicted with Social Security Ruling ("SSR") 83-14. (Pl.'s Br. at 5- 10.)

The Commissioner argues that (1) substantial evidence supports the decision that Claimant was disabled as of April 30, 2001, but not before; (2) the Appeals Council's ten day limit for filing an appeal is in accordance with SSA Publication No. 05-10041, January 2008, ICN 459260; (3) substantial evidence supports the Commissioner's final decision that Claimant can perform light work; and (4) the Appeals Council correctly found that Claimant was disabled under the Medical-Vocational Guidelines ("Grids") as of April 30, 2001. (Def.'s Br. at 4-9.)

Claimant first argues that there is no statutory support for the Appeals Council's statement in its decision that Claimant had ten days to appeal its decision. (Pl.'s Br. at 6, Tr. at 260.)

The Commissioner cites to SSA Publication No. 05-10041, and contends that the ten-day limit contained in the decision of the Appeals Council was stated in accordance with this publication. SSA Publication No. 05-11041 states as follows:

> In some cases, you may ask us to continue paying your benefits while we make a decision on your appeal. You can ask for your benefits to continue when:

12

> \* You are appealing our decision that you can no longer get Social Security disability benefits because your medical condition is not disabling; or
>
> \*You are appealing our decision that you are no longer eligible for SSI payments or that your SSI payment should be reduced or suspended.
>
> If you want your benefits to continue, you must tell us within 10 days of the date you receive our letter. If your appeal is turned down, you may have to pay back any money you were not eligible to receive.

(See # 18-1, p. 2.)

The Commissioner asserts that Claimant "received a partially favorable decision and thus, was entitled to receive benefits ... [h]ence, the 10-day notice was not an issue for Plaintiff because in accordance with the decision he was entitled to received benefits. Contrary to Plaintiff's assertion (Pl.'s Br. at 5-6), the Appeals Council's inclusion of the 10-day notice is in accordance with its Appeals Process, and designated in the SSA publication. Therefore, this Court should dismiss Plaintiff's contention as meritless." (Def.'s Br. at 5.)

The Commissioner essentially concedes that the SSA Publication he cites does not apply to the Claimant. The court's review of the regulations indicate Claimant's appeal was due in sixty days. 20 C.F.R. § 416.1481 (2008):

> The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision. The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised. You may file an action in a Federal district

> court within 60 days after the date you receive notice of the Appeals Council's action.

Claimant filed his complaint on February 21, 2008, within ten days after the decision of the Appeals Council on January 28, 2008, and within the sixty-day deadline provided above. While Claimant may be correct in his argument that he had sixty days to appeal, the court can conceive of no harm to Claimant in light of the fact that he met the deadline.

Next, Claimant argues that the ALJ erred in accepting the opinion of Dr. Marshall, a nonexamining expert who testified at the administrative hearing, over that of Dr. Kessinger, Claimant's treating physician. Claimant argues that the ALJ should have clarified Dr. Kessinger's opinion in December of 2000, that Claimant could not do manual labor and should have asked her about Claimant's difficulties with standing and walking. (Pl.'s Br. at 6-8.)

In his decision, the ALJ ultimately adopted the opinions of Dr. Marshall and the State agency medical sources, all of whom opined that Claimant was capable of light work. (Tr. at 284.) The ALJ explained that he was not unmindful of Dr. Kessinger's December 2000, opinion that Claimant was unable to tolerate manual labor. The ALJ wrote that he

> agrees that the claimant would be unable to tolerate heavy or medium exertional activity given his history of treatment of low back pain and MRI evidence of disc disease, bulging, and stenosis. Although the relevant treatment evidence indicates that the claimant's pain

> symptoms are well-controlled with his medication regimen, the undersigned accepts that the claimant would be precluded from engaging in heavier exertional activity, given the findings as noted (although I note that the claimant lifted a heavy object in January 2000 with no complaint of increased back pain - just some chest soreness [Exhibit B-5F at p 23]). However, Dr. Kessinger also stated that the claimant's "education and work experience and skills limit availability of work" (Exhibit B-5F at p 10). It is this statement to which I must disagree and place very limited weight. Dr. Kessinger is not a vocational expert. She has neither [a] degree nor apparent studies in vocational counseling. Her statements in this regard are little more than that of a lay person. As such I must accord little weight to such statement as it is out of her area of expertise. Any suggestion by Dr. Kessinger that the claimant is incapable of performing lighter exertional activity by virtue of [his] education and work background must be accorded minimal weight. Any suggestion that the claimant is precluded from lighter work due to his back and/or lung condition does not follow from the claimant's clinical evaluations. While Dr. Kessinger notes a bent posture and marked limp in November 2000 (Exhibit B-5F at p9), this is inconsistent with her treatment notes elsewhere, where the claimant's pain is well controlled with medication (Exhibit B-5F at p 25) [November of 1999] and gait is smooth (B-5F at p 38) [March of 1999]. Furthermore, clinical evaluations reflect intact neurological status, negative straight leg raise and no muscle spasm (Exhibit B-5F at pages 15 and 38) [October of 2000 and March of 1999].

(Tr. at 285.)

The ALJ further observed that while Claimant has positive MRI findings, there is no evidence of definitive disc herniation, vertebral fractures or radiculopathy and no indication for surgical intervention. The ALJ stated that while Dr. Kessinger

> noted a "marked" limp to the claimant's gait, her statement is not otherwise supported by objective findings which note a steady gait, even despite an observable limp. As noted by a treating chiropractor, the claimant also responded favorably to chiropractic

>     manipulative therapy and specific spinal adjustments in
>     the past and other routine follow up visits, [and] has
>     not required more aggressive pain management during the
>     relevant time period.

(Tr. at 286.)

The Appeals Council affirmed the findings of the ALJ, except for the finding that Claimant was disabled as of October of 2001. Instead, the ALJ found that Claimant was disabled as of April 30, 2001, for the reasons noted above. (Tr. at 269.)

The court finds that the ALJ properly weighed the evidence of record from Dr. Kessinger in keeping with the applicable regulations and case law, and his findings are supported by substantial evidence. The ALJ provides a well reasoned explanation for the weight afforded Dr. Kessinger's opinion. As the ALJ points out in his decision, Dr. Kessinger's objective findings do not support complete disability, particularly prior to April of 2001. The ALJ's interpretation of Dr. Kessinger's opinion about Claimant's abilities in October of 2000, when she believed Claimant could not perform manual labor was reasonable, particularly against the backdrop of her treatment notes at that time and the other evidence of record from examining and nonexamining sources. The ALJ's findings about Claimant's residual functional capacity are consistent not only with the opinion of Dr. Marshall, but also the State agency medical sources. Prior to April 30, 2001, the substantial evidence of record simply does not support a finding that Claimant was disabled. The ALJ was not obligated to contact

16

Dr. Kessinger for further development or clarification of the record.

Finally, Claimant argues that the ALJ's findings conflict with SSR 83-14 because it states that light work involves stooping, yet the ALJ's residual functional capacity finding limited Claimant to light work with no stooping. (Pl.'s Br. at 9-10.)

SSR 83-14 deals with the application of the Medical-Vocational Guidelines ("Grids") as a framework for evaluating a combination of exertional and nonexertional impairments. The Grids do not apply "to direct a conclusion of 'Disabled' or 'Not disabled' where an individual has a nonexertional limitation or restriction imposed by a medically determinable impairment. In these situations, the [Grids] are used, in conjunction with the definitions and discussions provided in the text of the regulations, as a framework for decisionmaking." SSR 83-14, 1983 WL 31254, at *1 (1983). SSR 83-14 "clarifies the distinction between exertional and nonexertional limitations and explains how the latter affect performance of work activities ... [and how] to evaluate the vocational effects of nonexertional impairments within the context of the exertionally based table rules where claimants or beneficiaries also have severe exertional impairments that limit them to sedentary, light, or medium work." Id.

The language from SSR 83-14 upon which Claimant relies states as follows:

> 2. Light exertion combined with a nonexertional impairment. The major difference between sedentary and light work is that most light jobs-- particularly those at the unskilled level of complexity--require a person to be standing or walking most of the workday. *Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist.* Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers. Rather, they require gross use of the hands to grasp, hold, and turn objects. Any limitation on these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work.
> Where a person has a visual impairment which is not of Listing severity but causes the person to be a hazard to self and others--usually a constriction of visual fields rather than a loss of acuity--the manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work (and medium work as well).
> On the other hand, there are nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base. Examples are inability to ascend or descend scaffolding, poles, and ropes; inability to crawl on hands and knees; and inability to use the finger tips to sense the temperature or texture of an object. Environmental restrictions, such as the need to avoid exposure to feathers, would also not significantly affect the potential unskilled light occupational base.
> Where nonexertional limitations or restrictions within the light work category are between the examples above, a decisionmaker will often require the assistance of a VS.

Id. at *4-5 (emphasis added).

The language of SSR 83-14 is not as definitive as Claimant suggests, and the court does not interpret it as such. Instead, the ALJ's findings, based upon the testimony of the vocational

expert, which testimony is consistent with the Dictionary of Occupational Titles ("DOT"), are supported by substantial evidence.

At the administrative hearing, the ALJ limited Claimant to no climbing, balancing, stooping, crouching, kneeling or crawling[1], in large part because this conclusion was reached by the ALJ in the earlier decisions. The ALJ noted that Dr. Marshall limited Claimant to only occasional stooping. (Tr. at 351.) In any event, although the vocational expert did not provide DOT numbers on the jobs identified at the administrative hearing, she testified that the light jobs she identified were consistent with the DOT definition. (Tr. at 352.) The court's review of the assembler (120,000 nationally and 9,600 regionally) and inspector (55,000 nationally and 3,300 regionally) jobs in the DOT indicate they do not involve any stooping. Department of Labor, Dictionary of Occupational Titles 619.381-010 (inspector); 723.684-010 (assembler) (4th ed. 1991); (Tr. at 287). Thus, the court finds that the ALJ/Appeals Council did not err in finding that Claimant could perform a substantial number of jobs in the national economy, at least prior to April 30, 2001.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this

---

[1] In his decision, the ALJ mistakenly refers to Claimant as only occasionally being able to climb, balance, stoop, crouch, kneel and crawl. (Tr. at 285.)

day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 19, 2009

                                           Mary E. Stanley
                                           United States Magistrate Judge